UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        v.                                    Case No. 10-CR-41

**DENNIS E. PENLTON,**

        **Defendant.**

---

## RECOMMENDATION THAT THE DEFENDANT'S MOTION TO SUPPRESS BE DENIED

On March 16, 2010, the grand jury returned a two count indictment charging Dennis E. Penlton ("Penlton") with possession of two firearms after having been convicted of a felony, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2), (Count 1), and possession of crack cocaine and marijuana in violation of Title 21, United States Code, Sections 842(a)(1) and 841(b)(1)(c), (Count 2). (Docket No. 1.) On April 9, 2010, Penlton filed a motion to suppress evidence and requested an evidentiary hearing. (Docket No. 8.) The government objected to the defendant's request for an evidentiary hearing, (Docket No. 9), and the defendant replied, (Docket No. 10.) On April 16, 2010, this court granted Penlton's request for an evidentiary hearing to resolve two narrow factual disputes:

    (1) Did Penlton expressly refuse to consent to law enforcement searching the residence; and, if so,

    (2) Where was Penlton when he expressly refused to consent to law enforcement searching the residence?

A summary of the evidence adduced at the evidentiary hearing is set forth below. The court ordered the parties to submit simultaneous post-hearing brief and replies, which the parties did. (Docket Nos. 24, 25, 26, 27.)

The pleadings on the defendant's motion to suppress are closed and the matter is ready for resolution. The Honorable Rudolph T. Randa has granted the parties' request to adjourn the previously scheduled jury trial date, and a new date has not yet been scheduled.

**EVIDENTIARY HEARING SUMMARY**

On the evening of January 22, 2010, detectives with the Milwaukee Police Department's Sensitive Crimes Division investigating the defendant's possible involvement in a sexual assault teamed up with police officers from the Neighborhood Task force to arrest Penlton on an outstanding municipal warrant for disorderly conduct. After receiving a briefing from Detectives Steven Wells ("Wells") and Brant Ungerer ("Ungerer"), and reviewing a photograph of the defendant, Milwaukee Police Officers John Schott ("Schott"), Montell Carter ("Carter"), and other members of the Neighborhood Task Force went to Penlton's residence on North 14th Street in Milwaukee along with the pair of detectives. Upon approaching the residence, Schott observed Penlton in the passenger seat of a pick-up truck parked on the street. Schott and another officer approached the truck and the other officer asked Penlton his name. When Penlton identified himself, Schott placed him under arrest. A search of Penlton's person incident to arrest revealed 6 corner cuts of marijuana and cocaine and a 9 inch leather sap (also known as a blackjack) in Penlton's possession. Within 5 minutes of Schott arriving at the scene, Penlton was placed in the back seat of a squad car that was parked in front of the truck.

Penlton testified that during these five minutes, while he was on the street outside the house, uniformed officers approached his residence and while on the porch yelled back to Penlton, "Who's in the house?" Penlton responded words similar to, "It doesn't matter who's in the house." The

2

officer responded that the door was unlocked and Penlton responded, "It don't matter if the door is unlocked."

The officer asked again who was in the house and Penlton alternatively testified that he either gave the same response or that he said words to the effect of "You can't search my house." The parties stipulated that all of the testifying law enforcement officers, if asked, would testify that they never heard Penlton make any refusal of consent to search.

Carter testified that when he arrived at the scene shortly after the uniformed officers, he went to the residence, and the defendant's girlfriend answered the door. She was cooperative and when asked for consent to search the residence, she agreed. Carter returned to his car to retrieve a Milwaukee Police Department consent to search form that she then signed. This form bears not only the signature of Penlton's girlfriend but also those of Carter and Wells as witnesses. A copy of the form was received as Exhibit 1 and the original was placed on inventory with the Milwaukee Police Department as item number 2 on inventory number 505578. Following the arrest of Penlton, Carter prepared a report in which he mistakenly identified the consent form as having been signed by Penlton; the evidence is undisputed that the form that Carter was referring to was actually signed by Penlton's girlfriend.

During the search of the residence, the officers discovered the firearms that form the basis for count 1 of the indictment as well as a safe, the contents of which emanated the odor of marijuana. Wells went outside to the squad car where Penlton was detained and asked Penlton for the combination to the safe. Penlton refused. But as Wells was walking away, Penlton called Wells back to the car by saying word to the effect of, "I'll give you the combination if you keep my girlfriend out of jail." Wells agreed and Penlton gave him the combination.

3

**ANALYSIS**

Although the warrantless search of a residence is ordinarily unreasonable per se, one way of avoiding the Fourth Amendment's warrant requirement is by way of obtaining the voluntary consent of a person with apparent authority to authorize the search. Georgia v. Randolph, 547 U.S. 103, 109 (2006). If two co-residents are both physically present and one consents to a search of a shared residence and the other refuses, the refusal prevails. Id. at 122. However, this does not impose a requirement upon the police to obtain the consent of each physically present co-resident before conducting a consent search; in the event of one co-resident consenting and the other remaining silent, the consent is valid. Id. Even if one co-resident expressly refuses consent, the police may nonetheless lawfully rely upon the subsequent consent of a co-resident, as long as the non-consenting co-resident is no longer physically present. United States v. Henderson, 536 F.3d 776, 784 (7th Cir. 2008).

In the present case, there is no dispute that Penlton's girlfriend voluntarily consented to the search of the residence. The only question is whether Penlton ever expressly refused consent and if so, was he "physically present" at the time?

The only evidence to support the contention that Penlton refused consent is his own testimony. He testified that when the officers were entering the residence he was asked if there was anyone in the house and he responded that they could not search his house. The court finds this testimony not to be credible for the following reasons.

Penlton's testimony was inconsistent. During questioning by the court regarding the alleged exchange between Penlton and an unidentified police officer, the court asked Penlton for the details and the following exchange ensued:

> Q. Mr. Penlton, you said the officer who was approaching the house looked back and said to you "Who is in the house?"
>
> A. Yes.

> Q. And then tell me what your response was?
>
> A. I told him, "It doesn't matter who is in the house." And he asked me again. And then I told him, I said, "It doesn't matter who is in the house." And they proceeded on what they was doing and put me in the squad car.
>
> Q. So from what you recall, the extent of your conversation, as best you can recall it, is the officer asked you twice who was in the house.
>
> A. Yeah.
>
> Q. And you said twice, don't matter or doesn't matter who is in the house.
>
> A. Yeah.
>
> Q. Did you say anything else?*
>
> A. All I know is I told them -- the first time when he asked me I told them he couldn't search, and I said it doesn't matter who is in the house when he asked me twice. He asked me twice.
>
> Q. See, I'm trying to find out exactly what you said. So the first time he said who is in the house, you said it doesn't matter; what were your words about the searching or can't search, the best you can recall?
>
> A. I told them they couldn't search my house. When he went up to the door and opened the door, he said, "Who is in the house?" I said, "You can't search my house." Then I said -- he said "Who is in the house" again; I says, "Man, it doesn't matter who is in the house." And I said it loud enough or he heard me say it. But it was happening so fast, you know, saying –
>
> Q. Let me ask this. Why did you say to him he could not search the house? Did they ask you can they search your house?
>
> A. He was going in the house already, basically. So I told him you can't search my house. He was already at the door. He was already at the door. He was already making entry or whatever. Because he said the door was unlocked. And I'm like it doesn't matter.

(Docket No. 18 at 68-70.)

Penlton initially testified that he was twice asked who was in the house and he twice responded that it did not matter who was in the house. (Docket No. 18 at 68-69; see also Docket No. 18 at 61.) He stated he was then placed in the squad car. In response to the court's follow-up

5

questions seeking clarification, Penlton confirmed this sequence of events. (Docket No. 18 at 68-69.) The court then asked if Penlton said anything else, and only then did Penlton seem to remember that he had omitted the crux of his claim. (Docket No. 18 at 69-70; see also Docket No. 18 at 62.)

A significant fact that is not captured in the transcript of this exchange is that between the court's question of whether the police said anything else, (denoted by an asterisk in the excerpt above), and Penlton beginning his response, there were, by the court's estimation, five full seconds of thought by Penlton. This substantial period of contemplation and deliberation was entirely inconsistent with the tempo and tenor of Penlton's other testimony. This suggests that once Penlton realized he had neglected the key component of his claim, he changed his testimony and included this refusal of consent in place of what had previously been merely a statement that it did not matter who was in the house. Such a seemingly conscious alteration of testimony is not indicative of truthfulness.

Based upon the inconsistencies in Penlton's testimony and his obvious self-interest in the proceedings, the court finds that Penlton's testimony is not credible and he never expressly refused consent to search his shared residence.

Having concluded that Penlton did not refuse consent, it is not necessary for the court to resolve the question of whether Penlton's position on the street outside of his house, although within shouting distance of the front door, was sufficient to constitute a "physical presence" under Randolph.

**IT IS THEREFORE RECOMMENDED** that Penlton's motion to suppress, (Docket No. 8), be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation or prior

to the Final Pretrial Conference, whichever is earlier. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 20th day of May, 2010.

s/AARON E. GOODSTEIN<br>U.S. Magistrate Judge